**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ClaimSolution Incorporated, | No. CV-23-02379-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| TheBest Claims Solutions Incorporated, et al., | |
| Defendants. | |

This is a trademark infringement case between two competitors in the attention-grabbing field of insurance claims processing and administration. Plaintiff, ClaimSolution Inc. and owner of the registered trademark "CLAIMSOLUTION," argues Defendant TheBest Claims Solutions Inc. improperly appropriated its mark, spurring the instant dispute.

Before the Court is Plaintiff's Motion for Partial Summary Judgment (Doc. 48) and Defendant's Motion for Summary Judgment (Doc. 53). The Court held oral argument on August 12, 2025 (Doc. 66), and now rules.

## I.     BACKGROUND

### A.     Factual Background

Since 1995, Plaintiff ClaimSolution Inc. has been in the business of insurance claims processing and administration. (Doc. 48-3 at 83.) Plaintiff offers services such as independent appraisals for auto accidents or catastrophic events. (*Id.*; Doc. 57-1 at 12.) It markets these services to various insurance companies including fleet and self-insured

companies. (Doc. 48-3 at 83.)

Plaintiff owns the word mark "CLAIMSOLUTION," Registration No. 3,324,297, which was registered October 30, 2007. (Doc. 48-2 at 2.) Plaintiff's Registration Certificate provides that its mark is used in "insurance claims processing and insurance claims administration services other than the processing of insurance claims of damages or broken vehicular wind shields and windows." (*Id.*) Plaintiff also owns a design trademark incorporating the "CLAIMSOLUTION" word mark, Registration No. 3,119,834, which was registered July 25, 2006. (*Id.* at 4.) The design mark is similarly used in connection with "insurance claims processing and insurance claims administration services." (*Id.*) Additionally, Plaintiff owns and operates the domain www.claimsolution.com to market its services to the public. (Doc. 48-3 at 84.) On the homepage of the website, Plaintiff's slogan reads, "The Solution To All Your Claims Needs." (Doc. 48-2 at 7.)

Like Plaintiff, Defendant TheBest Claims Solutions Inc. is also in the business of insurance claims processing and administration. (Doc. 1 ¶¶ 15-16; Doc. 9 ¶¶ 15-16.) Defendant originally conducted business under the name "TheBestIRS"—with "IRS" meaning "Insurance Recruiting Specialists." (Doc. 53-2 at 7; Doc. 59-1 at 26.)[1] Today, Defendant provides recruiting and staffing services in addition to a variety of claims processing services across various areas. (Doc. 48-3 at 27.) Defendant markets its services to "insurance carriers, who operate within the automative, property and contents insurance industry," and "transacts business within its warranty division with customers based in manufacturing." (*Id.* at 29.)

In or around November 2019, Defendant initiated a rebranding effort from "TheBestIRS" to "TheBest Claims Solutions," in part because Defendant added claims processing services alongside its existing recruiting and staffing services. (Doc. 48-2 at 44-46, -3 at 48; Doc. 57-2 at 48.) As part of its rebranding, Defendant changed its domain name from www.thebestirs.com to www.thebestclaims.com in 2020. (Doc. 48-2 at 43;

---

[1] Defendant owns two trademark registrations under "TheBestIRS," used in connection with "employment agency services; employment staffing in the field of insurance; professional staffing and recruiting services." (Doc. 53-2 at 8-9; Doc. 60 at 26.) Defendant's marks are not at issue in this action.

Doc. 53-2 at 10.) Defendant also retained counsel to conduct a trademark viability search near the close of 2019. (Doc. 48-3 at 27.) Following the search, Defendant received a document listing all registered trademarks similar to "TheBest Claims Solutions"—and Plaintiff's mark was amongst the results. (*Id.* at 66-67.) Defendant publicly announced its rebrand "[i]ntroducing the new look, new name, and future of TheBestIRS" in an online press release published January 14, 2021. (*Id.* at 48.)

Plaintiff was made aware of Defendant's company in or around July 2021, and on August 6, 2021, Plaintiff sent Defendant a cease-and-desist letter, notifying Defendant of its infringement on its marks. (Doc. 48-2 at 18-19, 35.) Defendant responded, noting the alleged weaknesses of Plaintiff's claim and arguing its use is protected under the classic fair use defense. (Doc. 53-2 at 81-83.) This lawsuit followed.

### B.  Procedural Background

Plaintiff filed its Complaint on November 13, 2023, alleging trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(A) (Count I), common law trademark infringement and unfair competition under Arizona law and the Lanham Act (Count II), and seeking a petition for cancellation of Defendant's mark under the Lanham Act (Count III).[2] (Doc. 1.)

Plaintiff now moves for partial summary judgment as to liability on its claims for trademark infringement under the Lanham Act (Count I) and common law trademark infringement and unfair competition (Count II). (Doc. 48.) Defendant cross-moves for summary judgment on Counts I-III of Plaintiff's Complaint and requests an award of attorneys' fees. (Doc. 53.) Both motions are fully briefed. (Docs. 54, 57, 58, 60.)

## II.  LEGAL STANDARD

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any

---

[2] Defendant voluntarily surrendered the design mark Plaintiff seeks to cancel in Count III. (Doc. 53-2 at 71-75.) At oral argument, Plaintiff proposed dismissing Count III along with its profit disgorgement theory of damages. The parties agreed to file a joint status report regarding dismissal of these items on or before September 17, 2025. Therefore, the Court will not address Defendant's arguments as to Count III or damages.

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted); *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) (holding that the court determines whether there is a genuine issue for trial but does not weigh the evidence or determine the truth of matters asserted).

When the "parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citation modified). The summary judgment standard operates differently depending on whether the moving or non-moving party has the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When the movant bears the burden of proof on a claim at trial, the movant "must establish beyond controversy every essential element" of the claim based on the undisputed material facts to be entitled to summary judgment. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (citation modified). If the movant fails to make this showing, summary judgment is inappropriate, even if the non-moving party has not introduced contradictory evidence in response. When, on the other hand, the non-movant bears the burden of proof on a claim at trial, the movant may prevail either by citing evidence negating an essential element of the non-movant's claim or by showing that the non-movant's proffered evidence is insufficient to establish an essential element of the non-movant's claim. *See Celotex*, 477 U.S. at 322-23; *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).

## III.    DISCUSSION

Plaintiff and Defendant each seek summary judgment in their favor. Given the significant overlap, the Court combines the parties' arguments by issue.

### A.     Evidentiary Objections

The Court first addresses the parties' evidentiary objections. Evidence submitted in a motion for summary judgment must satisfy the requirements of Federal Rule of Civil Procedure 56. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). The Court will rule only on the objections with respect to the evidence upon which the Court relies in adjudicating the summary judgment motions.[3]

#### 1.     Authentication

Starting with authentication: "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). This means the Court generally cannot consider unauthenticated evidence because "authentication is a condition precedent to admissibility." *Id.*

Plaintiff argues Exhibits 2 and 10 to Defendant's motion cannot be considered because they are not properly authenticated. (Doc. 57 at 10-11.) Plaintiff's authentication arguments, however, are moot because the Court permitted Defendant to supplement its motion with authenticating declarations. (Doc. 63; *see also* Doc. 59-1 (authenticating Exhibits 1-4, most emails in Exhibit 5, and Exhibits 8, 10-19).) Accordingly, the Court overrules Plaintiff's objection as to this evidence and will consider it in assessing the pending motions.

#### 2.     Hearsay

The Court now turns to Defendant's objection that certain evidence submitted by Plaintiff is inadmissible hearsay and therefore, cannot be considered. (Doc. 60 at 6.) Hearsay is an out-of-court statement offered in evidence "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is generally inadmissible unless it is defined as non-hearsay under Rule 801(d) or falls within a hearsay exception. *Id.*; Fed. R. Evid. 802.

Defendant objects to Plaintiff's Exhibit 23 on hearsay grounds.[4] (Doc. 54 at 6; Doc.

---

[3] The Court's analysis does not rely on defense exhibits 1, 5, 12, 16, 17, 18, 19, and therefore, the Court declines to address Plaintiff's objections relating to that evidence at this time.

[4] Although lacking in clarity, Defendant also seems to object to Plaintiff's Exhibit 22,

60 at 6.) Exhibit 23 consists of a declaration from Plaintiff's chief marketing officer, Dale Mason, who states that at a trade show conference, he spoke with a client representative who referred to Plaintiff's and Defendant's employees as "the two ClaimSolution guys." (Doc. 48-3 at 92; *see also id.* at 87.) Relying on *Lahoti v. VeriCheck, Inc.*, 636 F.3d 501 (9th Cir. 2011), Plaintiff argues these statements are not hearsay because they are not offered to prove the truth of the matter asserted, or they are admissible under the state of mind exception. (Doc. 48 at 14 n.1.)

In *Lahoti*, two witnesses testified for the defendant about "a substantial number of telephone calls from confused customers who could not find information about Vericheck [the defendant's company] on www.vericheck.com [the plaintiff's domain]." 636 F.3d at 509. On appeal, the plaintiff argued this testimony should not have been considered because it contained inadmissible hearsay. *Id.* The Ninth Circuit disagreed, recognizing that the customers' statements of confusion were hearsay but admissible under the state of mind exception. *Id.* (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:15 (4th ed. Supp. 2010) and "noting that the 'majority of courts' have so found and opining that such testimony 'is not hearsay'").

In light of *Lahoti*, the representative's statement to "the two ClaimSolution guys" is not hearsay if offered solely to show the speaker's state of mind—namely, that the speaker was confused about the association of the individuals referenced. But the evidentiary value of the statement for that purpose is somewhat limited, as the phrase "the two ClaimSolution guys" does not by itself convey the speaker's confusion. Rather, it is the surrounding context which informs any inference of confusion. And therefore, the statement presupposes the very thing it seeks to prove: confusion. At this time, and given the Ninth Circuit's guidance in *Lahoti*, the Court will overrule Defendant's hearsay objection and consider the evidence in assessing the likelihood of confusion.

---

where Plaintiff's CEO declared that at a trade show conference, she spoke with a client who "expressed his confusion thinking that [Defendant's employee] Todd had worked for ClaimSolution." (Doc. 48-3 at 87.) Because the arguments substantively overlap, the Court will overrule any hearsay objection as to Exhibit 22 for the reasons provided herein.

### B.    Count I: Trademark Infringement

The Court now turns to the substance of the parties' motions. Both parties cross-move for summary judgment on Count I, trademark infringement. (Doc. 48 at 9-16; Doc. 53 at 7-15.)

Under the Lanham Act, a defendant is liable for trademark infringement if he uses a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" in commerce without the consent of the registrant, and "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(a). To prevail on a trademark infringement claim, a plaintiff must demonstrate "(1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (citation modified). The parties only contest the latter requirement.

"The core element of trademark infringement is the likelihood of confusion." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999) (citation modified). "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002) (citation modified).

The Ninth Circuit uses the eight *Sleekcraft* factors to guide the likelihood of confusion analysis, assessing: (1) the similarity of the marks; (2) the proximity or relatedness of the companies' goods or services; (3) the strength of the mark; (4) evidence of actual confusion; (5) the marketing channels used; (6) the type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting its mark; and (8) the likelihood of expansion into other markets. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), *abrogated on other grounds by*, *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003). To defeat summary judgment, a plaintiff "must show sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely 'possible.'" *M2 Software, Inc., v. Madacy Ent.*, 421

1    F.3d 1073, 1085 (9th Cir. 2005) (citation omitted); *see also Rearden LLC v. Rearden Com.,*

2    *Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012) ("[A] plaintiff must show more than simply a

3    possibility of such confusion.").

### 1.    The Relevant Consumer Market

5            Before turning to the *Sleekcraft* factors, the Court "must define the relevant

6    consumer market because 'a court conducting a trademark analysis should focus its

7    attention on the relevant consuming public.'" *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2

8    F.4th 1150, 1160-61 (9th Cir. 2021) (quoting *Rearden*, 683 F.3d at 1214).

9            Plaintiff argues both its and Defendant's services are marketed to two groups:

10   (1) independent claims adjusters who work as independent contractors for the parties; and

11   (2) companies seeking to hire outside vendors for claims processing. (Doc. 48 at 15; Doc.

12   58 at 10; *cf.* Doc. 48-3 at 83 ("ClaimSolution markets its services to insurance companies

13   and fleet and self-insured companies.").) Defendant represents that its consumer base

14   consists of "insurance carriers, who operate within the automotive, property and contents

15   insurance industry." (Doc. 48-3 at 29.) Defendant argues "independent appraisers are not

16   the end consumers of either party's services." (Doc. 60 at 5.)

17           The Court agrees with Defendant. The trademark infringement analysis centers on

18   whether a "reasonably prudent *consumer*" in the marketplace is likely to be confused.

19   *Entrepreneur Media*, 279 F.3d at 1140. This is because "trademark infringement protects

20   only against mistaken purchasing decisions and not against confusion generally." *Bosley*

21   *Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005) (citation modified). At oral

22   argument, when asked whether independent insurance adjusters can be fairly categorized

23   as consumers, Plaintiff's counsel acknowledged that they are not customers but nonetheless

24   essential figures in Plaintiff's business model. Because there is no evidence independent

25   insurance adjusters are consumers of either party's services, the Court concludes that the

26   relevant consumer market is the companies, including insurance companies, who hire

27   Plaintiff and Defendant to handle insurance claims processing and administration.

28           That does not mean confusion on the part of independent claims adjusters is *per se*

irrelevant. Indeed, the Ninth Circuit has recognized that non-consumer confusion may be relevant in "three specific and overlapping circumstances—namely where there is confusion on the part of: (1) potential consumers; (2) non-consumers whose confusion could create an inference that consumers are likely to be confused; and (3) non-consumers whose confusion could influence consumers." *Rearden*, 683 F.3d at 1214. Critically, however, the Ninth Circuit limited its holding to these three scenarios, expressly declining to decide whether confusion on the part of other non-consumers "[such] as vendors and suppliers, potential employees, and investors should be considered merely because such confusion could affect the trademark holder's business, goodwill or reputation." *Id.* at 1214 n.9. Therefore, evidence of confusion on part of the independent claims adjustors and other non-consumers is relevant only insofar as it bears a relationship to confusion in the relevant consumer market, which here, consists of "companies, including insurance companies."

## 2. The *Sleekcraft* Factors

The Court now turns to the *Sleekcraft* factors, which "guide the court in assessing the basic question of likelihood of confusion." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992) (citation modified). "The presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion." *Id.* Rather, the Court considers whether a likelihood of confusion exists under the totality of the circumstances. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014).

### i. Similarity of the Marks

"The first *Sleekcraft* factor—the similarity of the marks—has always been considered a critical question in the likelihood-of-confusion analysis." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000); *see also Brookfield Commc'ns*, 174 F.3d at 1054 ("The similarity of the marks will always be an important factor."). "Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com*, 202 F.3d at 1206. Three axioms guide the Court's analysis on this factor. First, "the court is to view the marks as a whole, as they appear in

the marketplace," *E. & J. Gallo Winery*, 967 F.2d at 1291, rather than taking a "deconstructionist view of the different components of the marks," *Active Network, Inc. v. Elec. Arts Inc.*, No. 10-cv-01158, 2010 WL3463378, at *3 (S.D. Cal. Aug. 31, 2010). Second, because similarities may be more than merely visual, the marks must be compared "in terms of appearance, sound, and meaning." *GoTo.com*, 202 F.3d at 1206. Third, "similarities are weighed more heavily than differences." *Id.* Where services are directly competitive, the degree required to prove a likelihood of confusion is less than in the case of dissimilar services. *Sleekcraft*, 599 F.2d at 350.

Plaintiff argues the dominate portion of its marks consist of the words "claim" and "solution," and Defendant's name in the marketplace—also incorporating "claims" "solutions"—is confusingly similar. (Doc. 48 at 12-13.) Citing to out-of-circuit authority, Plaintiff contends that merely placing a generic, or descriptive superlative, such as "TheBest" before "claims" "solutions" does little to avoid consumer confusion.[5] (*Id.*) In response, Defendant contends that the dominate portions of its mark—the initials "TB" and name "TheBest"—distinguish Defendant's mark from Plaintiff's. (Doc. 53 at 11; Doc. 54 at 9.) According to Defendant, "TheBest" is dominate because Defendant is referred to as "TheBest" by the general consuming public. (Doc. 53 at 2-3; *see also* Doc. 48-3 at 48; Doc. 53-2 at 42.) The parties' marks as they appear in the marketplace are presented below:[6]



The Court observes that the marks both use the words "claim" and "solution" and therefore, convey a common meaning—namely, that both companies offer solutions to insurance claims processing. The marks are also similar in sound. Although Defendant uses

---

[5] (Doc. 48 at 12-13 (citing *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994) and *S&P Glob. Inc. v. S&P Data LLC*, 619 F. Supp. 3d 445, 456 (D. Del. 2022).) The Court is not bound nor persuaded by these authorities and declines to address them here.

[6] The parties dispute which version of marks should be compared in assessing this factor. (*See* Doc. 48 at 12; Doc. 54 at 9.) Because the marks must be assessed as they appear in the marketplace, *GoTo.com*, 202 F.3d at 1206, the Court will compare each company's logo as presented to the general consuming public.

the plural of each word (*i.e.*, "Claims Solutions") whereas Plaintiff adopts the singular iteration (*i.e.*, "ClaimSolution"), the marks sound similar when spoken aloud. Critically, however, Defendant's use of "claims solutions" is always accompanied after the dominate portion of its mark, "TheBest," which militates against the marks' similarity in both sound and meaning.

Visually, the marks are not similar. As one can plainly observe in a side-by-side comparison, the parties use different fonts, words, stylizations, and shades of blue. The dominate portions of Defendant's mark include a "TB" stylized logo and Defendant's name "TheBest" in a larger distinct font. Given that "TheBest" visually dominates the design of Defendant's mark, consumers are likely to have different impressions of each brand when encountered in the marketplace and are therefore, less likely to experience confusion. *In re Electrolyte Lab'ys, Inc.*, 929 F.2d 645, 647 (Fed. Cir. 1990) ("More dominant features will, of course, weigh heavier in the overall impression of a mark."). Additionally, the words "Claims Solutions," as used in Defendant's mark, are two separate words in a much smaller font. In contrast, Plaintiff's mark combines the terms "claim" and "solution" in a single word—"ClaimSolution"—followed by "INC," styled in a thin, black serif font. Plaintiff's mark also incorporates a swoosh design, in a lighter shade of blue compared to Defendant's mark. These visual differences cut against a likelihood of confusion.

As further evidence of similarity, Plaintiff argues Defendant's slogan, "Claim Solutions, Reimagined" reinforces similarities with Plaintiff's brand and slogan, "ClaimSolution, the solution to all your claims needs." (Doc. 48 at 13; *see also* Doc. 48-2 at 7; -3 at 69.) Defendant contends the phrase "Claim Solutions, Reimagined" is not a slogan, but referenced solely in its pitch material to a limited audience and not the consumer public at large. (Doc. 54 at 4.) But testimony from Defendant's CEO Bradley Dunlap appears to refute that assertion. When asked, "Is Claim Solutions, Reimagined, is that a slogan that is used within the company?" Mr. Dunlap responded, "Yes." (Doc. 48-2 at 106-07.) Later in his deposition, Mr. Dunlap explained that this phrase is used merely to describe Defendant's services. (*Id.* at 108, 111.) The Court recognizes that Mr. Dunlap's

testimony could be construed as identifying "Claim Solutions, Reimagined" as a slogan in the colloquial sense—not in the legal sense as a brand identifier. But an evaluation of Mr. Dunlap's testimony is an issue best reserved for the trier of fact.

Given this evidence, a rational trier of fact could find Defendant's use of "Claims Solutions" in its slogan and marks confusingly similar to Plaintiff's, even though the marks create different visual impressions. Because this Court must weigh similarities more heavily than differences, the Court concludes that this factor tilts in favor of Plaintiff.

### ii.    Proximity or Relatedness of the Parties' Services

On the next factor, the Court assesses the relatedness of the parties' services. The more closely related the parties' services, the more likely consumers will be confused by similar marks. *See Brookfield Commc'ns*, 174 F.3d at 1055. To determine relatedness, courts consider whether the services (1) are "complementary," (2) share the "same class" of consumers, and (3) are "similar in use and function." *Network Automation*, 683 F.3d at 1150 (citation omitted). The ultimate question is whether the services "would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n.10 (citation modified).

Defendant concedes that the services between Plaintiff and Defendant are substantially related. (Doc. 53 at 8; Doc. 54 at 9.) Indeed, testimony from Defendant's sales executive, Todd Yanak, confirmed there are overlapping services between the companies. (Doc. 48-2 at 57-58.) Accordingly, this *Sleekcraft* factor favors Plaintiff.

### iii.    Strength the Mark

The Court turns to the strength of the mark factor. "The scope of the trademark protection that we give marks depends upon the strength of the mark, with stronger marks receiving greater protection than weak ones." *Entrepreneur Media*, 279 F.3d at 1141. A strong mark is one that is likely to be "remembered and associated in the public mind with the mark's owner." *Brookfield Commc'ns*, 174 F.3d at 1058. Courts measure a mark's strength both conceptually and commercially. *See Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("The strength of the mark is a key factor

1    with two components: the mark's recognition in the market (*i.e.*, its commercial strength)

2    and the mark's inherent distinctiveness (*i.e.*, its conceptual strength)."), *abrogated on other*

3    *grounds by*, *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 426 (2020).

### a.    Conceptual Strength

5        The conceptual strength of a mark depends on where it falls on a spectrum ranging

6    from "generic" (conceptually weak) to "arbitrary" (conceptually strong). *Moose Creek, Inc.*

7    *v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1224 (C.D. Cal.), *aff'd*, 114 F. App'x

8    921 (9th Cir. 2004). Plaintiff argues its ClaimSolution word mark and design mark are

9    properly classified as "fanciful" and "arbitrary" marks, and therefore, conceptually strong.

10   (Doc. 48 at 10; Doc. 57 at 13.) In response, Defendant argues Plaintiff's marks are merely

11   descriptive. (Doc. 53 at 8-10; Doc. 54 at 7-9.)

12       Often the conceptually strongest, "[a]rbitrary and fanciful marks have no intrinsic

13   connection to the product with which the mark is used." *Brookfield Commc'ns*, 174 F.3d

14   at 1058 n.19.[7] "A suggestive mark conveys an impression of a good but requires the

15   exercise of some imagination and perception to reach a conclusion as to the product's

16   nature." *Id.* A mark is descriptive if it "directly describe[s] the quality or features of the

17   product." *Id.* Lastly, generic marks "refer generally to the product rather than a particular

18   brand of the product." *Id.* Arbitrary, fanciful, and suggestive marks are considered

19   "inherently distinctive" and automatically receive protection because they immediately

20   identify the source of a product or service. *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749,

21   760 (9th Cir. 2006). Descriptive marks, however, receive protection only if they acquire

22   secondary meaning in the marketplace. *Fortune Dynamic, Inc. v. Victoria's Secret Stores*

23   *Brand Mgmt., Inc.*, 618 F.3d 1025, 1033 (9th Cir. 2010).

24       The Court finds that Plaintiff's marks cannot be classified as arbitrary or fanciful.

25   The word "ClaimSolution" consists of the words "claim" and "solution"—neither of which

26   are made-up nor used in an arbitrary sense. Rather, the mark is intrinsically connected to

27   _____

[7] A mark is arbitrary if it uses English words arbitrarily, *see, e.g.*, *Fleischmann Distilling*
28   *Corp. v. Maier Brewing Co.*, 314 F.2d 149, 154 (9th Cir. 1963) ("Black & White" scotch
     whiskey), whereas fanciful marks consist of made-up words, *see, e.g.*, *Clorox Chem. Co.*
     *v. Chlorit Mfg. Corp.*, 25 F. Supp. 702, 705 (E.D.N.Y. 1938) ("Clorox" bleach).

1   Plaintiff's services: offering "solutions" to insurance "claims" via claims processing and
2   administration. (Doc. 48-3 at 83.) This means Plaintiff's mark falls somewhere between
3   the suggestive and descriptive categories—a distinction that is often difficult to delineate
4   with any meaningful degree of certainty. *See Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190,
5   1197 (9th Cir. 2009) ("[L]egions of trademark lawyers can stay busy arguing about how
6   marks in the middle, not so plainly descriptive, nor so plainly [suggestive], should be
7   categorized.").

8       To this end, the Court is guided by the Ninth Circuit's analysis in *Fortune Dynamic,*
9   *Inc. v. Victoria's Secret Stores Brand Management Inc.*, 618 F.3d 1025 (9th Cir. 2010).
10  There, the plaintiff, Fortune Dynamic and owner of the trademark "DELICIOUS" in
11  connection with its footwear, sued the defendant Victoria's Secret after it sold pink tank
12  tops displaying the word "Delicious." *Id.* at 1029. In assessing the conceptual strength of
13  Fortune's mark, the Ninth Circuit examined the dictionary definition of "delicious" and
14  employed both the imagination and competitor tests using the evidence in the record. *Id.* at
15  1033-34. Ultimately, the Ninth Circuit determined that a genuine issue of material fact as
16  to whether "DELICIOUS" is suggestive or descriptive precluded summary judgment. *Id.*
17  at 1034.

18      The Court will follow the same approach here. Beginning with the dictionary
19  definition of "claim solutions": the noun "claim" is defined as "a demand for something
20  due or believed to be due" such as "an insurance claim." *Claim*, Merriam-Webster,
21  https://www.merriam-webster.com/dictionary/claim (last visited Aug. 18, 2025). "Claim"
22  can also mean "a right to something," "an assertion open to challenge," or "something that
23  is claimed." *Id.* The word "solution" similarly has different meanings, including "an action
24  or process of solving a problem" or "an answer to a problem." *Solution*, Merriam-Webster,
25  https://www.merriam-webster.com/dictionary/solution (last visited Aug. 18, 2025).
26  Together, "claim solutions" connotes the following meaning: the process of solving a
27  problem related to a demand (such as an insurance claim).

28      Like the Ninth Circuit in *Fortune Dynamic*, the Court determines that a genuine

issue of material fact exists as to whether Plaintiff's mark is suggestive or descriptive. Some evidence suggests the mark is merely descriptive. For example, Defendant submitted evidence that at least twenty-five third-party companies employ the terms "claim" "solutions" in connection with their brand. (*See* Doc. 53-2 at 46-70.) A rational trier of fact could find that "claims solutions" is a phrase commonly used to describe a company's services in the marketplace. On the other hand, a rational trier of fact could also find that one needs to have some imagination—albeit not a particularly creative one—to connect "claim" "solutions" with Plaintiff's insurance claims processing services. *See Lahoti*, 636 F.3d at 507 (affirmed finding that the mark VERICHECK for check verification services was suggestive, not descriptive).

The distinction between suggestive and descriptive has legal significance because descriptive marks require proof of acquired distinctiveness (or secondary meaning) to be protectable, whereas suggestive marks do not. *Fortune Dynamic*, 618 F.3d at 1033. And if a mark is suggestive, a jury is more likely to reasonably conclude the strength of the mark factor weighs in favor of confusion. *Id.* at 1034.

While this issue is best left to a trier of fact, the Court observes that even if Plaintiff's mark is deemed suggestive, it is presumed conceptually weak.[8] *Brookfield Commc'ns*, 174 F.3d at 1058 (explaining that suggestive marks "are presumptively weak").

### b.    Commercial Strength

A conceptually weak mark, such as Plaintiff's, may have "its overall strength . . . bolstered by its commercial success." *M2 Software*, 421 F.3d at 1081. To assess a mark's commercial strength, courts look to whether the mark has attained "actual marketplace recognition." *Fortune Dynamic*, 618 F.3d at 1032-34 (citation omitted). Actual marketplace recognition may be demonstrated by commercial success (*i.e.*, sales),

---

[8] Plaintiff contends the incontestable status of its marks render it strong. (Doc. 48 at 10.) Critically, however, "the incontestable status of [a] mark does *not* require a finding that the mark is strong." *Entrepreneur Media*, 279 F.3d at 1142 n.3; *see also* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:155 (5th ed. 2025) ("The status of incontestability relates solely to the *validity* of the registered mark. The . . . commercial and marketplace strength of the mark relates solely to the separate issue of *infringement* of the mark."). Therefore, the incontestable status of Plaintiff's mark does not, by itself, establish the mark's strength.

advertising expenditures, length of exclusive use, and public recognition. *M2 Software*, 421 F.3d at 1081.

Plaintiff argues its marks are commercially strong because it has exclusively used them in commerce as early as 1999 and extensively advertised. (Doc. 57 at 13.) Plaintiff further contends it has "invested in these marks such that they are among [] some of the most recognizable marks in the insurance industry." (Doc. 48 at 10.) In support, Plaintiff represents that between 2019 and 2023, it spent between $55,097.48 and $156,903.76 each year in connection with advertising and promoting its services with its trademarks.[9] (Doc. 48-3 at 85.)

Plaintiff, however, has not presented any evidence of its exclusive use, sales volume, or public recognition, relating to its marks.[10] And even when there is evidence relating to advertising expenditures and sales, "the absence of any indication that consumers recognize the mark undercuts that strength to a significant degree." *Great Am. Duck Races Inc. v. Kangaroo Mfg. Inc.*, 398 F. Supp. 3d 494, 505 (D. Ariz. 2019); *see also Brookfield Commc'ns*, 174 F.3d at 1058-59 (holding that "the district court did not clearly err in classifying 'MovieBuff' as weak" where the plaintiff claiming trademark infringement presented use of the mark for over five years, expenditures of $100,000 in advertising, and did "not come forth with substantial evidence establishing the widespread recognition of its mark"); *JL Beverage Co., LLC v. Beam, Inc.*, 318 F. Supp. 3d 1188, 1205 (D. Nev. 2018) (finding "JL Beverage's evidence"—consisting of less than $500,000 in advertising expenditures and only $2.6 million in sales—did "not show extensive sales or advertising, especially for a national market"), *aff'd sub nom.*, *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 815 F. App'x 110 (9th Cir. 2020).

Additionally, Defendant presented evidence that at least twenty-five third-party companies use the terms "claim" "solutions" in connection with their brand, further

---

[9] Plaintiff's advertising expenditures consist of $81,639.67 (2019); $55,097.48 (2020); $102,813.68 (2021); $147,962.15 (2022); and $156,903.76 (2023). (*Id.*)

[10] In fact, Plaintiff's word mark was initially refused registration due to a likelihood of confusion with registered mark, "Alliance Claims Solutions,"—suggesting Plaintiff's use of the mark "ClaimSolution" has not been exclusive since approximately 1999, as Plaintiff avers. (Doc. 54-1 at 3-6.)

decreasing the marks' strength as a brand identifier. (*See* Doc. 53-2 at 46-70 (including "Claim Solutions USA," "Ryze Claim Solutions," "One Claim Solution," "NICFI Claims Solutions," amongst others).) As observed by the Ninth Circuit, "[w]hen similar marks permeate the marketplace, the strength of the mark decreases." *One Indus., LLC v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1164 (9th Cir. 2009); *Entrepreneur Media*, 279 F.3d at 1144 ("[T]hat the marketplace is replete with products using a particular trademarked word indicates not only the difficulty in avoiding its use but also, and directly, the likelihood that consumers will *not* be confused by its use."); *Great W. Air, LLC v. Cirrus Design Corp.*, 649 F. Supp. 3d 965, 979 (D. Nev. 2023) (explaining "evidence that three other companies in the aviation market use the name Cirrus . . . weakens the Cirrus mark's commercial strength"), *aff'd*, No. 23-15157, 2024 WL 5134351 (9th Cir. Dec. 17, 2024).[11]

Given that the term "claim solutions" permeates the marketplace, and because Plaintiff did not present sufficient evidence of the marks' commercial strength, the Court finds the commercial strength factor favors Defendant.

### iv.   Evidence of Actual Confusion

The next *Sleekcraft* factor assesses evidence of actual confusion. Evidence of actual confusion is evidence "that use of the two marks has already led to confusion" among consumers. *Sleekcraft*, 599 F.2d at 352. Evidence of past confusion is, obviously, "persuasive proof that future confusion is likely." *Id.* The absence of such evidence, however, is not necessarily fatal. *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991); *see also Brookfield Commc'ns*, 174 F.3d at 1050 ("[A]ctual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy."). At the same time, a lack of consumer confusion evidence, especially when the marks have coexisted for a significant

---

[11] Plaintiff contends Defendant's dilution argument is unpersuasive because many of the cited companies using the term "claim solutions" "are not in the same industry as Plaintiff." (Doc. 57 at 14.) The Court disagrees. Evidence that a term is used ubiquitously, even across various industries, may be considered in assessing the mark's strength. *See Collins v. U.S. Dep't of Veterans Affs.*, 497 F. Supp. 3d 885, 895 (S.D. Cal. 2020) (evidence that "the term 360 is used ubiquitously" across "thousands of other registered and asserted trademarks" suggests the marks are conceptually weak).

period of time, can serve as evidence that future confusion is unlikely. *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842-43 (9th Cir. 2002); *see also* Restatement (Third) of Unfair Competition § 23 cmt. d (A.L.I. 1995) ("[W]hen the parties have made significant use of their respective designations in the same geographic market for a substantial period of time, the absence of any evidence of actual confusion may in some cases justify an inference that the actor's use does not create a likelihood of confusion.").

In analyzing this factor, the Court is guided by the principle that "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Bosley Med. Inst.*, 403 F.3d at 677 (citation modified). And therefore, the confusion analysis must center on "confusion in the marketplace, as opposed to generalized public confusion." *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1535 n.5 (9th Cir. 1989). As this Court previously noted, non-consumer confusion may be relevant, provided there is evidence of confusion as to: "(1) potential consumers; (2) non-consumers whose confusion could create an inference that consumers are likely to be confused; and (3) non-consumers whose confusion could influence consumers." *Rearden*, 683 F.3d at 1214. In these three instances, however, the non-consumer confusion must have a direct relationship to consumer confusion. *Id.*

Plaintiff points to two purported instances of actual confusion as evidence in support of this factor.[12] The Court discusses each in turn.

### a.    July 6, 2021 Email from Gerald Anderson

On July 6, 2021, Gerald Anderson, an independent claims adjuster Plaintiff previously hired, emailed Plaintiff's vendor relations director after receiving a phone call from one of Defendant's then-employees. (Doc. 48-2 at 35; *see also id.* at 105, -3 at 85.) The email said, "Got a call today from The Best Claim Solution, out of Phoenix AZ. Are you familiar with them at all?" (Doc. 48-2 at 35.) Mr. Anderson titled the email, "Do you

---

[12] The record also contains evidence of an email erroneously sent to Plaintiff by an employee of Defendant. (Doc. 53-2 at 43.) Defendant argues this was "due to a mix-up in names" as opposed to a mix-up in companies. (Doc. 53 at 12.) Because Plaintiff does not dispute Defendant's characterization, or otherwise rely on this incident as evidence of actual confusion, the Court will not consider it in assessing this factor.

know of this claims company???" (*Id.*)

Plaintiff construes this email as meaning Mr. Anderson "was so confused he contacted Plaintiff thinking there was an association between the two companies." (Doc. 48 at 13.) But a rational trier of fact could find that this evidence, on its own, is not evidence of confusion—let alone *consumer* confusion. For instance, the plain language of the email implies that Mr. Anderson understood the two companies to be separate, as evidenced by him asking, "Are you familiar with *them*?" and "Do you know of *this* claims company???" (Doc. 48-2 at 35 (emphasis added).) Additionally, Mr. Anderson is a non-consumer. And Plaintiff has presented no evidence or argument as to how evidence of any confusion on the part of Mr. Anderson bears a relationship to consumer confusion. Without more, this evidence does not constitute evidence of actual consumer confusion. *See Dynamic Aviation Grp. Inc. v. Dynamic Int'l Airways, LLC*, No. 5:15-CV-00058, 2016 WL 1247220, at *26 (W.D. Va. Mar. 24, 2016) (an email from a non-consumer reporter seeking clarification about the past relationship between two companies was not actual evidence of confusion).

### b. November 2024 Tradeshow Conference

In November 2024, Plaintiff's director of marketing, Dale Mason, and Defendant's senior vice president of sales, Todd Yanak, both attended a tradeshow convention in Las Vegas, Nevada. (Doc. 48-2 at 59-60, -3 at 91-92.) There, a representative of the host company allegedly referred to Mr. Mason and Mr. Yanak as "the two ClaimSolution guys." (Doc. 48-3 at 91-92.) According to Mr. Mason, Mr. Yanak replied, "[D]on't even go there. I'm with TheBest Claims Solutions." (*Id.*) Mr. Mason understood the statement to mean that the representative recognized the similarities between the two companies. (*Id.*) During Mr. Yanak's deposition, counsel for Plaintiff asked whether he recalled the representative's statement "Oh, look at the claim solution guys getting along," to which Mr. Yanak replied, "I don't remember that, no." (Doc. 48-2 at 61.) Mr. Yanak also represents that he has "never confused the two companies," that he has "never met anyone who was confused between the two companies," and that at previous conferences, Plaintiff's employees never "made any comments regarding name confusion." (Doc. 53-2 at 41.)

Again, this evidence alone does not appear to be evidence of actual confusion. Hearsay considerations aside,[13] the representative's spontaneous reference to both employees as the "claims solutions guys"—where both companies' names include the terms "claim" "solutions"—is too far attenuated to constitute evidence that the representative herself was confused. Indeed, as Defendant aptly notes, this statement can equally be interpreted as inferring the representative was surprised the employees were socializing while involved in active litigation.

Plaintiff's evidence of actual confusion is *de minimis* at best and "[d]e minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding likelihood of confusion." *Mattel, Inc. v. MCA Recs. Inc.*, 28 F. Supp. 2d 1120, 1149 (C.D. Cal. 1998) (quoting *Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1535 (10th Cir.), *cert. denied*, 513 U.S. 1052 (1994)), *aff'd*, 296 F.3d 894 (9th Cir. 2002); *see also Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 722 (9th Cir. 2024) (weighing de minimis evidence of actual confusion against plaintiff because the evidence painted a picture that contradicted the plaintiff's arguments for confusion), *cert. denied sub nom.*, *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, No. 24-953, 2025 WL 1496488 (U.S. May 27, 2025); *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625 (9th Cir. 2005) (holding that there was no dispute of material fact regarding likelihood of confusion, in part because the "scant evidence" of confusion consisted of "[a] single retailer and a single customer" mistaking the brands).

While this factor bears little weight in the overall analysis, the Court finds that it weighs against a likelihood of confusion.

### v.    Marketing Channels Used

The Court turns to the next *Sleekcraft* factor—the marketing channels used. "Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. In assessing this factor, the critical question is whether "the general class of . . . purchasers exposed to the products overlap." *Id.*; *see also Pom Wonderful*, 775 F.3d

---

[13] *See supra* III.A.2.

1  at 1130 ("In assessing marketing channel convergence, courts consider whether the parties'

2  customer bases overlap and how the parties advertise and market their products.").

3          As evidence supporting a likelihood of confusion, Plaintiff points to testimony from

4  Defendant's employee Todd Yanak, who explained that they have promoted services to

5  overlapping clients. (Doc. 48-2 at 63-64.) Defendant acknowledges, "the marketing

6  channels used by Plaintiff and Defendant are substantially similar." (Doc. 54 at 12.)

7  Therefore, this factor favors Plaintiff.

8                          **vi.    Degree of Consumer Care**

9          The next *Sleekcraft* factor assesses the degree of care likely to be exercised by

10 consumers of the junior user's goods. 599 F.2d at 353. "The reference point for this

11 factor 'is the typical buyer exercising ordinary caution.'" *Fortune Dynamic*, 618 F.3d at

12 1038 (quoting *Sleekcraft*, 599 F.2d at 353). When consumers exercise a high degree of

13 care, they are less likely to be confused. *See Brookfield Commc'ns*, 174 F.3d at 1060

14 ("We expect [a consumer] to be more discerning—and less easily confused—when he is

15 purchasing expensive items and when the products being sold are marketed primarily to

16 expert buyers." (citation omitted)). Conversely, when consumers exercise a low degree of

17 care, they are more likely to be confused. *Id.*

18         Plaintiff argues independent claims adjustors are less sophisticated and exercise a

19 low degree of care, which tilts this factor in favor of confusion.[14] (Doc. 48 at 15; Doc. 58

20 at 10.) But as this Court has already determined, independent claims adjustors are not part

21 of the relevant consumer base. *See supra* III.B.1. And even if this Court considered the

22 independent adjustors' degree of care, "confusion on the part of a non-sophisticated

23 non-consumer may shed little or no light on whether a sophisticated consumer would

24 likewise be confused." *Rearden*, 683 F.3d at 1214-16. Therefore, the Court concludes that

25 the relative degree of care exercised by independent claims adjustors is largely irrelevant

26 ───────────────

[14] Plaintiff states, "Defendant admitted the independent claims adjusters exercise a low
27 degree of care" and "do not exercise much care when they decide companies to take work
from." (Doc. 48 at 15.) But Plaintiff cites to no record evidence in support of this assertion,
28 and in adjudicating a motion for summary judgment, conclusory statements by counsel
without evidentiary support are insufficient to raise a genuine dispute of material fact. *See
Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

1    to the overall confusion analysis.

2        As to the relevant consumer market, Plaintiff concedes this *Sleekcraft* factor "is

3    arguably neutral in the context of insurance companies." (Doc. 48 at 15; Doc. 57 at 17.)

4    Conversely, Defendant argues that its consumers—principally, insurance company

5    executives—are highly sophisticated consumers who purchase expensive services and

6    exercise a high degree of care, thereby tilting this factor against a likelihood of confusion.

7    (Doc. 54 at 12-13; Doc. 53 at 14.)

8        The evidence in the record consists of testimony from Bradley Dunlap, Defendant's

9    CEO, who explained that securing a new client is a "very difficult" and "very long process

10   within the insurance industry," requiring "[v]ery hard work, multiple phone

11   calls . . . appointments[,] . . . meeting with people," and compiling various pilots and

12   reports. (Doc. 54-1 at 39-40.) Defendant's employee, Todd Yanak, similarly testified that

13   "[t]here's an extensive level of vetting within the insurance industry," requiring various

14   meetings and requests for proposals over the course of months. (*Id.* at 42-43.) Mr. Yanak

15   also recognized, however, that the actual vetting process varies greatly across insurance

16   companies. (*See* Doc. 48-2 at 65 (explaining that "[e]very customer has their own form of

17   vetting" across varying degrees of sophistication).)

18       In light of this conflicting testimony and because Plaintiff concedes this *Sleekcraft*

19   factor is neutral, the Court weighs it neither in favor nor against a finding of confusion.

20                    **vii.    Defendant's Intent**

21       The seventh *Sleekcraft* factor assesses the defendant's intent in selecting the mark.

22   *Sleekcraft*, 599 F.2d at 349. "When the alleged infringer knowingly adopts a mark similar

23   to another's, reviewing courts presume that the defendant can accomplish his purpose: that

24   is, that the public will be deceived." *Entrepreneur Media*, 279 F.3d at 1148 (citation

25   modified). This factor is of "minimal importance" in assessing a likelihood of consumer

26   confusion, *GoTo.com*, 202 F.3d at 1208, since "an intent to confuse consumers is not

27   required for a finding of trademark infringement." *Brookfield Commc'ns*, 174 F.3d at

28   1059.

1    In favor of confusion, Plaintiff argues Defendant admitted it rebranded with the

2  name "TheBest Claims Solutions" knowing Plaintiff owned the "ClaimSolution" word

3  mark. (Doc. 48 at 15.)[15] This is because Defendant performed a trademark viability search

4  in 2019 and the results included Plaintiff's registered mark. (*Id.*; *see also* Doc. 48-3 at 27,

5  66-67.) Defendant argues it was not actually aware of Plaintiff's company until receiving

6  the August 6, 2021 cease-and-desist letter. (Doc. 53 at 15.) And mere knowledge of another

7  mark's existence is insufficient to show an intent to deceive consumers. (*Id.*)

8    Defendant is mistaken. In the Ninth Circuit, "[t]his factor favors the plaintiff where

9  the alleged infringer adopted his mark with knowledge, actual or constructive, that it was

10  another's trademark." *Brookfield Commc'ns*, 174 F.3d at 1059. At minimum, Defendant

11  can be fairly charged with constructive knowledge of Plaintiff's mark—even if it lacked

12  *actual* knowledge of the mark—given the trademark viability search conducted in 2019.

13  And yet, because this factor is relatively unimportant to the overall analysis, the Court

14  concludes that it tilts only slightly in favor of Plaintiff.

### viii.    Likelihood of Expansion

16    That brings the Court to the final *Sleekcraft* factor: the "likelihood of expansion of

17  the product lines." *Sleekcraft*, 599 F.2d at 349. This factor "is relatively unimportant where

18  two companies already compete to a significant extent." *Brookfield Commc'ns*, 174 F.3d

19  at 1060; *see GoTo.com*, 202 F.3d at 1209 ("Because Disney and GoTo compete with one

20  another by providing similar Internet search engines, we decline to evaluate the issue of

21  whether there is a likelihood of expansion of their product lines.").

22    Because both parties concede they are direct competitors, this factor does not weigh

23  in favor nor against a finding of confusion. *See Yuga Labs, Inc. v. Ripps*, 144 F.4th 1137,

24  1174 (9th Cir. 2025) (holding that "this factor does not move the needle one way or

25  another" where the parties directly compete).

---

[15] Plaintiff cites to pages 51 through 59 of Amy Ward's deposition as evidence Defendant adopted its mark with knowledge of Plaintiff's mark. (Doc. 48 at 15 (citing Ex. 9 at 51:20-59:8).) But pages 51 through 55 are not included in the attached excerpt.

1

2      ix.    **Factors as a Whole**

3          And finally, the Court "must consider the *Sleekcraft* factors as a whole to determine

4      whether a likelihood of confusion results from [Defendant's] use of the marks."

5      *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1078 (9th Cir. 2006).

6      As previously noted, summary judgment will be granted in favor of the defendant unless

7      the plaintiff demonstrates "sufficient evidence to permit a rational trier of fact to find that

8      confusion is 'probable,' not merely 'possible.'" *M2 Software*, 421 F.3d at 1085 (citation

9      omitted). At the same time, summary judgment is generally disfavored in trademark

10     disputes given the intensely factual nature of the confusion inquiry. *See Interstellar*

11     *Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999).

12         This case presents a close call. Four *Sleekcraft* factors favor Plaintiff. There is a

13     genuine dispute of material fact as to the mark's conceptual strength, but at best, the mark

14     is suggestive and therefore presumed conceptually weak. And the other factors either weigh

15     against confusion, or add little to the overall analysis. The Court must construe the evidence

16     in a light most favorable to each non-moving party, and in doing so, the Court concludes

17     that summary judgment is not appropriate for either Plaintiff or Defendant. A jury will

18     ultimately need to weigh the evidence and make the conclusive determination as to the

19     likelihood of consumer confusion.[16]

20         Accordingly, the Court will deny Plaintiff's motion as to liability in Count I and

21     deny Defendant's motion as to Count I.

22     **3.    Fair Use Defense**

23         Defendant argues it is entitled to summary judgment because its use is protected by

24     the classic fair use doctrine. (Doc. 53 at 16-17.) In response, Plaintiff contends Defendant

25     cannot rely on the fair use defense for two reasons: first, because Defendant uses "claim

26     solutions" as a trademark, and second, because Defendant cannot establish it used the mark

27     in good faith. (Doc. 57 at 18-20.)

28         Section 1115(b) of the Lanham Act codifies the common law classic fair use

_____

[16] Because the Court will deny both parties' motions for summary judgment, it need not consider Defendant's request for attorneys' fees. (Doc. 53 at 19-20.)

defense, which recognizes that "[a] junior user is always entitled to use a descriptive term in good faith in its primary, descriptive sense other than as a trademark." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:45 (5th ed. 2025). To claim this defense, three elements must be satisfied: "(1) Defendant's use of the term is not as a trademark or service mark; (2) Defendant uses the term fairly and in good faith; and (3) Defendant uses the term only to describe its goods or services." *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002) (citation modified). In the Ninth Circuit, however, "the classic fair use defense is not available if there is a likelihood of customer confusion as to the origin of the product." *Id.* And therefore, the defense is relevant only insofar as it "complements the likelihood of customer confusion analysis set forth in *Sleekcraft*." *Id.*

Because triable issues of fact remain as to the likelihood of consumer confusion, it is more appropriate for Defendant to raise the fair use defense at trial. *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1269-70 (S.D. Cal. 2018) (holding "Defendants are not precluded from raising the fair use defense" where disputed material facts exist as to the likelihood of confusion).[17] The Court will deny Defendant's motion for summary judgment on the fair use defense.

## C.    Count II: Unfair Competition

The parties also cross-move on Plaintiff's claim for common law trademark infringement and unfair competition—each of which require a likelihood of consumer confusion. *See Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997) (explaining that likelihood of confusion is the "basic test" for common law trademark infringement); *Taylor v. Quebedeaux*, 126 Ariz. 515, 516 (1980) ("[T]he essence of unfair competition is confusion of the public."). Because there is a genuine dispute of material fact as to the likelihood of confusion, the Court will deny summary

---

[17] Unlike a classic fair use defense, where a defendant uses the plaintiff's mark only to describe its own goods, the nominative fair use analysis applies where a defendant uses the plaintiff's mark to describe the plaintiff's product. *Cairns*, 292 F.3d at 1151. This is significant because "[a] court may find classic fair use despite 'proof of infringement,'" whereas "nominative fair use . . . represents a finding of no liability" for trademark infringement. *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1183 n.11 (9th Cir. 2010). In this case, Defendant does not employ "claims solutions" in reference to Plaintiff's mark, or otherwise argue the nominative fair use defense applies.

judgment to either party on Count II.

The Court also declines to address Defendant's argument that Count II should be dismissed because "Plaintiff likely lacks sufficient standing to substantiate its allegation of common law trademark infringement in Arizona." (Doc. 53 at 18.) Defendant offers no legal authority in support of its argument or otherwise explain its position in any meaningful detail.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 48) is denied.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 53) is denied.

Dated this 21st day of August, 2025.

Michael T. Liburdi
United States District Judge